# IN THE SUPREME COURT OF TENNESSEE
## SPECIAL WORKERS' COMPENSATION APPEALS PANEL
### AT KNOXVILLE
Assigned on Briefs July 6, 2022

## FOOD LION, INC. v. KATHRYN WILBURN

### Appeal from the Chancery Court for Campbell County
#### No. 15550    Elizabeth C. Asbury, Chancellor

FILED

JAN 11 2023

Clerk of the Appellate Courts
Rec'd by



---

## No. E2021-01494-SC-R3-WC - MAILED 11/3/2022

---

Kathryn Wilburn fractured her pelvis during the course and scope of her employment with Food Lion, Inc. Wilburn and Food Lion entered into a settlement agreement that obligated Food Lion to provide for future medical treatment related to Wilburn's fractured pelvis. More than a decade later, Food Lion filed a petition to determine whether Wilburn's ongoing treatment for pain was causally related to that injury. After considering the report and testimony of the physician who conducted an independent medical examination ("IME") at Food Lion's request and the C-32 form of Wilburn's authorized treating physician, the trial court denied the petition. It also denied Wilburn's request for attorney's fees under Tennessee Code Annotated section 50-6-204(b)(2). The appeal has been referred to the Special Workers' Compensation Appeals Panel for a hearing and a report of findings of fact and conclusions of law under Tennessee Supreme Court Rule 51. We affirm the judgment of the trial court.

**Tenn. Code Ann. § 50-6-225(e)(3) (2014 Repl.) (applicable to injuries occurring prior to July 1, 2014) Appeal as of Right; Judgment of the Chancery Court Affirmed**

SARAH K. CAMPBELL, J., delivered the opinion of the court, in which ROBERT E. LEE DAVIES, SR. J. and THOMAS J. WRIGHT, SR. J., joined.

Ameesh A. Kherani, Clinton, Tennessee, for the appellant, Kathryn Wilburn.

Daniel I. Hall and Jon-Michael T. McNew, Bristol, Tennessee, for the appellee, Food Lion, Inc.

# OPINION

## Factual and Procedural Background

On December 2, 2001, Kathryn Wilburn fractured her pelvis when the pallet jack she was driving at a Food Lion distribution center collided with a concrete pillar. Dr. Robert L. Chironna and Dr. Edward Workman were Wilburn's authorized treating physicians. Dr. Chironna assigned Wilburn a whole-body impairment rating of ten percent based on her physical injuries. Dr. Workman, who is board certified in psychiatric medicine and pain medicine, assigned Wilburn an additional three-percent impairment rating for pain control "to be added to any orthopedic rating."

In April 2007, Food Lion and Wilburn reached a settlement agreement based on a thirteen-percent impairment rating. Food Lion agreed to pay Wilburn a lump-sum award of $38,557.50.[1] It further agreed to pay Wilburn's "compensable, reasonable and necessary future medical treatment related to the subject injury . . . pursuant to Tenn. Code Ann. § 50-6-204." Tennessee Code Annotated section 50-6-204 (2014 Repl.),[2] in turn, provides in relevant part that:

> The employer or the employer's agent shall furnish, free of charge to the employee, such medical and surgical treatment, medicine, medical and surgical supplies, crutches, artificial members, and other reasonable and necessary apparatus, including prescription eyeglasses and eye wear, such nursing services or psychological services as ordered by the attending physician and hospitalization, including such dental work made reasonably necessary by accident as defined in this chapter.

Tenn. Code Ann. § 50-6-204(a)(1)(A) (2014 Repl.).

The settlement agreement identified Dr. Chironna and Dr. Workman as Wilburn's authorized treating physicians. Dr. Chironna's impairment rating of Wilburn from 2003, which was attached to the court order approving the settlement agreement, noted that Wilburn's symptoms "seem[ed] referable to right lower extremity and low back pain." Dr. Chironna observed that Wilburn had "documented nerve root irritation by electrodiagnostic testing" and "a history of fractures in the right pelvis . . . consistent with [] persisting pain syndrome, reactive muscle spasm and muscle guarding."

---

[1] The Second Injury Fund was also a party to the settlement agreement. The Fund agreed to pay Wilburn $89,967.50.

[2] All citations to the 2014 replacement volume of Title 50 of the Tennessee Code Annotated are to the version applicable to injuries occurring before July 1, 2014.

2

Dr. Workman first evaluated Wilburn in 2002 and treated her regularly for pain management over the years. The office note from Dr. Workman's examination of Wilburn in November 2004, which also was attached to the order approving the settlement agreement, reflects that Dr. Workman had diagnosed Wilburn as having "[m]yofascial leg and hip pain, pain disorder mixed, [and] severe psychiatric co-morbidity, including pain exacerbated panic episodes." He noted at that time that Wilburn's "mood dysregulation is complicated by severe cluster B Axis II pathology" and that her "[c]luster B personality pathology [was] also rate limiting her functional restoration and lowering her pain tolerance" and limiting "her ability to tolerate stress and pain."

Dr. Workman was treating Wilburn's diagnoses and related symptoms with eight different medications, including Celexa, Premarin, Soma, Prevacid, Klonopin, trazodone, Duragesic, and MiraLAX. Wilburn complained a few days after the November 2004 office visit that the Duragesic Patch "made [her] suicidal." Dr. Workman assessed Wilburn by phone for suicide risk and explained to Wilburn that the patch may be the "only hope [she] has for pain control given her treatment history." Based on that discussion, Wilburn "request[ed] to continue the patch." Dr. Workman considered Wilburn to have reached maximum medical improvement at that time.

In October 2019—more than a decade after the settlement agreement was entered—Food Lion obtained an independent psychiatric evaluation of Wilburn from Dr. J. Sidney Alexander. As part of that evaluation, Dr. Alexander reviewed Wilburn's medical records spanning from 2001 through 2019, including records from Dr. Workman but not Dr. Chironna. He also examined Wilburn personally and administered two different tests: (1) the Structured Inventory of Malingered Symptomatology ("SIMS"), which is used to detect malingering; and (2) Central Nervous System Vital Signs ("CNSVS"), a set of tests used to assess cognitive skills. Wilburn's score of 28 on the SIMS was "well above the recommended cutoff score (>14) for the identification of suspected malingering" and "indicate[d] that she strongly malingered." Her scores on the CNSVS "indicate[d] that she purposely tried to score exceedingly lower than are her actual abilities" and further "showed that she actively malingered."

Based on his personal examination of Wilburn, his review of her medical records, and Wilburn's test results, Dr. Alexander gave Wilburn a primary diagnosis of "Mixed Personality Disorder, With Borderline, Narcissistic, Histrionic and Dependent Features." He explained that personality disorders are "formed from genetics and from childhood parenting and experiences." He noted that Dr. Workman "documented from his [own] testing results that Mrs. Wilburn showed 'serious Axis II pathology.'" Dr. Alexander described serious axis II pathology as "synonymous for a serious personality disorder of the type [he] ha[d] diagnosed." Dr. Alexander observed that, even though Dr. Workman "clearly indicated numerous times that [Wilburn] has a serious personality disorder," he had "steered clear of diagnosing" Wilburn with that condition. He faulted Dr. Workman for failing to "adequately [take] into account the need to rule out malingering and a

3

personality disorder" as the cause of Wilburn's "erratic course of complaints and responses to medicines." In Dr. Alexander's opinion, Wilburn's "psychiatric symptoms [were] not directly caused by her 2001 work injury" but rather by her mixed personality disorder, which pre-existed the work injury. Dr. Alexander acknowledged that it would be appropriate for Wilburn to continue her "ongoing treatment with her current providers" and her "current medications." In his view, however, the need for this treatment was "due to genetics, childhood difficulties, and adult life choices" rather than her work injury.

In 2020, Food Lion petitioned the trial court for an order determining that the treatment provided by Dr. Workman "is not causally related to" Wilburn's pelvic fracture and that Food Lion is therefore "not responsible for this medical treatment." The trial court held a hearing on the petition on September 27, 2021. Both parties submitted pretrial briefs and presented oral argument. Food Lion submitted the deposition testimony and IME report of Dr. Alexander.[3] In lieu of introducing deposition testimony from Dr. Workman, Wilburn submitted a C-32 form that Dr. Workman had signed on June 8, 2021.[4] By this time, Wilburn's other authorized treating physician, Dr. Chironna, was deceased.

Dr. Alexander's deposition testimony was consistent with his IME report. He again faulted Dr. Workman for failing to formally diagnose Wilburn with a personality disorder and for not adequately considering the possibility of malingering. Dr. Alexander also opined that Dr. Workman's treatment of Wilburn was not causally related to her 2001 work injury but was instead focused on symptoms caused by her personality disorder, which is "genetically and childhood generated." Yet Dr. Alexander acknowledged that Dr. Workman's diagnoses of Wilburn in 2019 were essentially the same as in 2004. He further acknowledged that Dr. Workman's "attempts at treating [Wilburn] were appropriate" and that he had "worked very diligently to try to help her." In Dr. Alexander's opinion, however, Dr. Workman "was treating borderline personality disorder and pain complaints" that "were coming from other core diagnoses"—namely, personality disorder and malingering.

In response to questions on the C-32 form about Wilburn's course of treatment and permanent restrictions, Dr. Workman referenced the office note from his November 2014 examination of Wilburn, which was attached to the form. Also attached to the C-32 form

---

[3] The record contains two depositions of Dr. Alexander. Dr. Alexander was first deposed on December 20, 2020, without the benefit of cross-examination because Wilburn was proceeding *pro se* at the time. Wilburn later retained counsel, who objected to the first deposition and participated in a second deposition of Dr. Alexander on May 7, 2021.

[4] A C-32 form is a standard form created by the Tennessee Bureau of Workers' Compensation to report medical information related to industrial injuries. Tennessee Code Annotated section 50-6-235 allows a party to introduce direct testimony from a physician through a written medical form established by the commissioner, such as a C-32 form, with proper notice. Tenn. Code Ann. § 50-6-235(c)(1)–(2) (2014 Repl.).

4

were records from a February 9, 2021 office visit. Those records reflect that Dr. Workman was continuing to treat Wilburn for "[p]ain disorder with related psychological factors," "[l]ow back pain," "[u]nspecified inflammatory spondylopathy, lumbar region," "[s]acrococcygeal disorders," "[g]eneralized anxiety disorder," "[p]ain in right leg," and "[m]ood disorder due to known physiological condition." Dr. Workman performed "[n]europsychiatric testing" at this visit, which allowed him to "assess the veracity of all patient's complaints and reports of symptoms and pain levels." Wilburn's prescribed medications included Ultram, Lunesta, omeprazole, NuLido, Linzess, cyclobenzaprine, Calypxo, and senna.

Under the heading "Causation," the C-32 form contained the following question: "From a medical standpoint, considering the nature of the patient's occupation and medical history along with the diagnosis and treatment, did this injury more probably than not arise out of the patient's employment?" Dr. Workman checked "Yes" in response to that question.

On October 18, 2021, the trial court denied Food Lion's petition. The court observed that Dr. Workman's diagnoses of Wilburn, which were made part of the final judgment approving the settlement agreement in this case, were the same in 2019 as in 2004. The court determined that Dr. Alexander's IME report and testimony failed to overcome the presumption of correctness afforded to the treatment recommendations of Dr. Workman as authorized treating physician. *See* Tenn. Code Ann. § 50-6-102(12)(A)(ii) (2014 Repl.). Finally, the court determined that the treatment being provided by Dr. Workman was primarily and causally related to the 2001 work injury. All issues regarding attorney's fees were held in abeyance.

Wilburn sought attorney's fees and reasonable discretionary costs under Tennessee Code Annotated section 50-6-204(b)(2) (2014 Repl.). Food Lion argued that fees and costs were not available under section 50-6-204(b)(2) because Food Lion continued to pay for Wilburn's medical treatment during the pendency of the petition. Thus, Food Lion had not "failed to furnish medical care" within the meaning of that provision. After a hearing on November 15, 2021, the trial court denied Wilburn's motion. The court relied on *Kephart v. Hughes Hardwood International, Inc.*, which interpreted section 50-6-204(b)(2) to "appl[y] to cases in which an Employer denies medical treatment, and the employee is forced to resort to judicial proceedings to obtain that care." No. M2011-01568-WC-R3-WC, 2012 WL 3329705, at *6 (Tenn. Workers Comp. Panel Aug. 15, 2012).

## Analysis

Wilburn appeals the trial court's denial of her motion for attorney's fees and costs. Food Lion urges the Panel to affirm the denial of Wilburn's motion but asks that we reverse the trial court's denial of its causation petition.[5]

In reviewing both questions, we must presume the trial court's factual findings are correct unless the evidence preponderates otherwise. Tenn. Code Ann. § 50-6-225(e)(2) (2014 Repl.). When the trial judge has had the opportunity to observe a witness's demeanor and to hear in-court testimony, considerable deference is given to the trial court's factual findings. *Madden v. Holland Grp. of Tenn., Inc.*, 277 S.W.3d 896, 898 (Tenn. 2009). On the other hand, when, as here, the record contains expert medical testimony presented by deposition or other documentary evidence, the reviewing court may draw its own conclusions with respect to the weight and credibility of the evidence. *Foreman v. Automatic Sys., Inc.*, 272 S.W.3d 560, 571 (Tenn. 2008).

We review questions of law de novo with no presumption of correctness. *Dixon v. Travelers Indem. Co.*, 336 S.W.3d 532, 536 (Tenn. 2011). Although we must construe workers' compensation laws equitably to achieve their remedial purpose, *see* Tenn. Code Ann. § 50-6-116 (2014 Repl.), we are "not at liberty to alter or extend the statutes beyond their obvious meaning," *Gerdau Ameristeel, Inc. v. Ratliff*, 368 S.W.3d 503, 506 (Tenn. 2012).

### I. Food Lion's Causation Petition

We begin with the causation issue. Tennessee Code Annotated section 50-6-102(12)(A)(ii) (2014 Repl.) provides that the opinion of the authorized treating physician "shall be presumed correct on the issue of causation but said presumption shall be rebutted by a preponderance of the evidence." To prove a fact by a preponderance of the evidence, a litigant must convince the trier-of-fact that it is more likely true than not. *See McEwin v. Tenn. Dep't of Safety*, 173 S.W.3d 815, 825 n.19 (Tenn. Ct. App. 2005).

The question before us is whether Food Lion has proved by a preponderance of the evidence that the conditions for which Dr. Workman was treating Wilburn were not causally related to her 2001 pelvic fracture. Food Lion contends that the evidence it presented in support of its causation petition—Dr. Alexander's IME report and deposition

---

[5] Wilburn contends the issue concerning Food Lion's causation petition is not properly before the Panel because Wilburn appealed only from the trial court's order denying the motion for attorney's fees and Food Lion did not file a cross-appeal. As Food Lion correctly points out, however, the trial court's order "dispose[d] of all pending issues and claims" and thus was a final order, and an appellee may raise additional questions of law in its brief without filing a cross-appeal. *See* Tenn. R. Civ. P. 54.02(1); Tenn. R. App. P. 3(a), 13(a).

testimony—successfully rebuts Dr. Workman's opinion on his C-32 form that his treatment of Wilburn is causally related to the pelvic fracture. Wilburn disagrees.

As a preliminary matter, we must address Wilburn's argument that consideration of Dr. Alexander's testimony was precluded because the trial court had previously prohibited the parties from litigating matters already adjudicated in the order approving the settlement agreement. As support for this argument, Wilburn cites to an agreed order purportedly entered "on or about July 9, 2021." However, that order is not part of the record on appeal.

Wilburn also filed a motion in limine to exclude portions of Dr. Alexander's testimony based on a purported conflict with the July 2021 order, but the trial court never ruled on Wilburn's motion and instead expressly considered Dr. Alexander's testimony in its order denying Food Lion's petition. Because Wilburn failed to renew her objection to admission of the testimony, she is not entitled to relief on that issue. *See, e.g., Duran v. Hyundai Motor Am., Inc.*, 271 S.W.3d 178, 191–92 (Tenn. Ct. App. 2008) (holding that defendants who failed to "renew their objections to the evidence they now insist was erroneously introduced" were not entitled to relief (citing Tenn. R. App. P. 36(a))).

Based on our own review of the record, we agree with the trial court that Food Lion has failed to rebut the presumption of correctness that attaches to Dr. Workman's opinion. To be sure, Dr. Alexander's IME report and deposition testimony suggest that a personality disorder may be at least partially to blame for Wilburn's myriad psychiatric symptoms and failure to respond to Dr. Workman's attempts at treatment. But Dr. Workman was well aware of Wilburn's "axis II pathology" when he made his initial diagnoses and treatment decisions in 2004. At that time, he considered that this pathology would complicate her treatment, "limit[] her functional restoration," "lower[] her pain tolerance," and limit "her ability to tolerate stress and pain."

Like the trial court, we find significant Dr. Alexander's acknowledgement that Dr. Workman's current diagnoses of Wilburn are materially identical to the diagnoses he made in 2004, which served as the basis for the 2007 settlement agreement. To the extent Dr. Workman's repeated references to "axis II pathology" and failure to formally diagnose a personality disorder raise questions about causation, those questions existed in 2004 when Food Lion agreed to provide for Wilburn's future medical expenses. It is unclear why Food Lion did not seek clarification on that issue before entering the settlement agreement or why it waited more than a decade to challenge Dr. Workman's treatment. Dr. Alexander acknowledged, moreover, that Dr. Workman's attempts to treat Wilburn "were appropriate," that treating Wilburn was a "tough task" given her varied symptoms and "rapidly changing responses to medication," and that Dr. Workman had "worked very diligently to try to help her."

Relying on *Russell v. Dana Corp.*, 2016 WL 4136548 (Tenn. Workers Comp. Panel Aug. 1, 2016), Food Lion contends that Dr. Alexander's opinion "rebuts any presumption

7

that should be afforded the single check-box, found within the C-32, by Dr. Workman." But Food Lion's reliance on *Russell* is misplaced.

The employer in *Russell* sought to remove the employee's authorized treating physician. *Id.* at \*1. Both the employer and employee submitted documentary evidence in lieu of live testimony. *Id.* at \*7. The C-32 form of the employer's expert—a board-certified pain management specialist—included a "full history" of the employee's "initial injury and subsequent medical treatment" along with "an assessment and analysis of the risks and benefits of each medication" the treating physician had prescribed. *Id.* The treating physician, by contrast, was not a qualified pain management specialist and submitted only a "handwritten response" that "lack[ed] any analysis or explanation of his own opinions as to why [e]mployee's pain medications [were] needed to treat her initial work injuries." *Id.* at \*8. In that case, the panel concluded that the employer had successfully rebutted the presumption of correctness afforded to the treating physician because the C-32 form of the employer's expert "st[oo]d in the record as virtually undisputed." *Id.*

We disagree with Food Lion that Dr. Workman's C-32 form is analogous to the handwritten response in *Russell*. Dr. Workman, a board-certified pain management specialist, attached medical records to his C-32 form from both his initial diagnoses of Wilburn in 2004 and his most recent examination of Wilburn in 2021, showing that those diagnoses had not changed. Dr. Workman's C-32 form is thus easily distinguishable from the bare-bones response at issue in *Russell*.

## II. Wilburn's Motion for Attorney's Fees

We now turn to Wilburn's argument that the trial court erred by denying her motion for attorney's fees and costs after she successfully defended against Food Lion's causation petition. As the trial court explained, Tennessee adheres to the "American rule" which allows a party in a civil action to recover attorney fees only if: "(1) a contractual or statutory provision creates a right to recover attorney fees; or (2) some other recognized exception to the American rule applies, allowing for recovery of such fees in a particular case." *Donovan v. Hastings*, ___ S.W.3d ___, No. M2019-01396-SC-R11-CV, 2022 WL 2301177, at \*3 (Tenn. 2022) (quoting *Cracker Barrel Old Country Store, Inc. v. Epperson*, 284 S.W.3d 303, 308 (Tenn. 2009)).

Wilburn sought attorney's fees under Tennessee Code Annotated section 50-6-204(b)(2), which provides in relevant part that:

> [A] court may award attorney fees and reasonable costs to include reasonable and necessary court reporter expenses and expert witness fees for depositions and trials incurred *when the employer fails to furnish* appropriate medical, surgical and dental treatment or care, medicine, medical and surgical

8

supplies, crutches, artificial members and other apparatus to an employee provided for pursuant to a settlement or judgment under this chapter.

Tenn. Code Ann. § 50-6-204(b)(2) (2014 Repl.) (emphasis added).

Citing *Kephart*, the trial court agreed with Food Lion that this provision applies only "to cases in which an employer denies medical treatment, and the employee is forced to resort to judicial proceedings to obtain that care." 2012 WL 3329705, at *6. Although the trial court acknowledged that Food Lion "want[ed] to terminate the provision of certain medical care," it concluded that section 50-6-204(b)(2) did not authorize the award of attorney's fees to Wilburn because at no time did Food Lion "fail to provide [Wilburn's] care."

*Kephart* concerned a settlement agreement in which the employer agreed to pay future medical expenses for reasonable and necessary treatment by the authorized treating physician, a pain management specialist. *Id.* at *1. The employer later requested that the employee be examined by a neurologist, but the employee refused. *Id.* at *2. The employer filed a motion to require the employee to submit to the examination but did not stop paying for the employee's treatment by the pain management specialist. *Id.* at *1–3.

The employee successfully opposed the motion. On appeal, the employee argued that he was entitled to attorney's fees under Tennessee Code Annotated section 50-6-204(b)(2) for having to defend against the motion. *Id.* at *5. The panel concluded that the employee had waived the attorney's fees issue by failing to raise it below. But it also stated that the employee would not be entitled to attorney's fees in any event because section 50-6-204(b)(2) "applies to cases in which an employer denies medical treatment, and the employee is forced to resort to judicial proceedings to obtain that care." *Id.* at *6. The employer in *Kephart* had not denied medical treatment, so the employee was not entitled to fees. *Id.*

Wilburn concedes that "Food Lion continued to provide treatment" while it litigated its causation petition. She nevertheless contends that *Kephart* is distinguishable because the employer in that case did not seek to terminate the employee's medical care as Food Lion did in this case. Wilburn contends that Food Lion's causation petition effectively forced her to "resort to judicial proceedings to obtain care" because her "benefits would have been terminated by a default judgment" had she not defended against the petition.

We do not think this distinction calls for a different result here. *Kephart* stated that the employee in that case was not entitled to attorney's fees because the employer did not fail to furnish medical treatment. 2012 WL 3329705, at *6. The panel's reasoning in no way turned on the nature of the employer's motion. Here, it is undisputed that Food Lion never stopped paying for Dr. Workman's treatment of Wilburn. Because the plain language

9

of section 50-6-204(b)(2) allows an award of attorney's fees only when the "employer fails to furnish" appropriate medical treatment, Wilburn is not entitled to fees.[6]

Wilburn also argues that denying attorney's fees here would be contrary to public policy because it would make it difficult, if not impossible, for employees to "secure assistance of counsel" to defend against motions of this sort. We acknowledge that employees in Wilburn's situation—facing a post-settlement motion that seeks to terminate the employee's benefits—will be hard pressed to retain counsel absent the possibility of an attorney's fee award. Even if an employee's original counsel is still available, it is unlikely the representation agreement contemplated such a future challenge, particularly without additional compensation. This policy argument, however, is more appropriately addressed to the legislature. Because the statute at issue allows attorney's fees only "when the employer fails to furnish" appropriate medical treatment, and it is undisputed that Food Lion continued paying for Dr. Workman's treatment of Wilburn at all relevant times, the trial court properly denied Wilburn's motion.

## Conclusion

For the foregoing reasons, the judgment of the trial court is affirmed. The costs of this appeal are taxed to Kathryn Wilburn, for which execution may issue if necessary.

SARAH K. CAMPBELL, JUSTICE

---

[6] Wilburn urges this panel to construe section 50-6-204(b)(2) liberally in favor of the injured worker. *See Clark v. Lowe's Home Ctrs.*, 201 S.W.3d 647, 650 (Tenn. 2006) ("[W]e give the Workers' Compensation Law a remedial, equitable construction in favor of injured workers."). But that rule of construction does not permit us to disregard the statute's plain terms. *See, e.g., Gerdau Ameristeel*, 368 S.W.3d at 506 (explaining that courts are "not at liberty to alter or extend the statutes beyond their obvious meaning").